MISSOURI, KANSAS & TEXAS RAILWAY COMPANY OF TEXAS v.
F. C. JAHN.

Decided January 5, 1898.

1. **Railway—Injury to Person in Charge of Cattle—Negligence—Contributory Negligence.**

See opinion for evidence held to support a finding of negligence by carrier and due care by injured person, in case of injury to drover in charge of live stock, caught between drawheads by movement of train, while looking after cattle down in cars.

2. **Same.**

A shipper in care of live stock during their transportation by rail has a right to rely on the assurance of the conductor, when directed to look after cattle, that the train will remain standing long enough for that purpose, and to expect that it will not be moved without notice to him while so engaged.

**3. Same.**

It was immaterial that the injured person was engaged in getting up cattle of another than his employer, where stock of various owners were carried on one train, and their several agents, with the knowledge of the conductor and under the direction of one in general charge of all the stock, attended to any cattle found down, without regard to ownership.

Appeal from Caldwell. Tried below before Hon H. Teichmueller.

*A. B. Storey,* for appellant.

*Burgess & Hopkins,* for appellee.

Key, Associate Justice.—Appellee brought this suit to recover damages for personal injuries and obtained a verdict and judgment for $823. The first assignment of error presents two questions of fact, viz., that the defendant was not guilty of any negligence, and that the plaintiff was guilty of contributory negligence.

The testimony shows that a train of live stock, consisting of about 15 cars, was shipped from Gonzales, Texas, to St. Louis, Mo.; that the cattle in two of the cars belonged to one Cardwell; that the plaintiff, in order to obtain transportation to St. Louis, went along to look after Cardwell's cattle, and traveled on a drover's pass indorsed on the back of the contract under which Cardwell's cattle were shipped. The train was made up of live stock belonging to several different owners; and the testimony shows that one M. P. Evans was in charge of all the stock on the entire train; that the plaintiff and other persons serving in similar capacities were under his direction, and were to look after the stock generally, without regard to any particular car or who owned the stock. Their duties were to look after the stock and "punch them up" when they found them down. The testimony also shows that Cardwell's cattle were in cars at the rear of the train, and were not in either of the cars between which the plaintiff was caught and injured.

Among other things, the plaintiff testified as follows: "I went with a cattle train in May, '95; left Gonzales of the 18th day of May. I went with Mr. Cardwell's cattle; Mr. Evans had charge of the train; we had fifteen cars when we left Gonzales; three more cars were attached at Waco, but were detached at Hillsboro. At Denton we had the original fifteen with which we started. I traveled on Mr. Cardwell's cattle contract, as the man in charge of his two cars, and my duties were to assist Mr. Evans to look after the train of cattle and get them up when they got down. Just before we got to Denton a brakeman came in and told the conductor there was some cattle down, and the conductor said to us, "There are some cattle down. We will stop at Denton and you will have time to get out and get them up." When the train stopped, we got out and went to work. I got out on the west side of the train. Some of the men stopped to get up some cattle, and I went on towards the front end of the train. I do not know exactly

where Mr. Cardwell's cattle were in the train. I saw a cow down on the opposite side of the car from where I was, and I started to go between the cars, and just as I started across, they ran the engine back and caught my foot, I think between the drawheads. At that time I was trying to get over to get the animal up I had seen down. At that time, I did not know where the engine was. I supposed it was where it belonged. There were no signals given. I think I would have heard it, if they had been given. I was a new hand, and was a little bit scared,. and was only a short distance from the engine. I was right between the fifth and sixth car. When I got caught, two men lifted me down and carried me to the depot. My foot was caught and mashed between the drawheads. When I got it out, it was not as wide as my thumb. * * * I do not know exactly where the Cardwell cars of cattle were. I do not think they were together. One of them was toward the head end of the train. I do not think it was the third car from the engine. Mr. Evans' cattle were at the head of the train, and he wanted to ship his through to Chicago, and I am not sure if it was the fourth car from the engine. I do not really know now where they were. I had assisted before that in getting up the cattle all along the road. When we got out at Denton our party divided; Mr. Evans, Frank Stephens, and Mr. Harndon were on the opposite side of the train from me. I had not gotten up any cattle at the time I was hurt. Mr. Potts got up the only one we found down on our side. I went from Mr. Potts on down the train, when I found the one down on the opposite side. I think it was Mr. Cardwell's cow. * * * I saw the animal down. I put my punch rod down, and caught hold of the brake bars at the end of the train, and swung myself up. I got both feet up there on that wooden thing at the end of the train, and before I could balance to jump, they struck the train and it nearly threw me flat; in trying to regain my balance, I got my foot caught. I do not know whether it was between the drawheads or between the iron and the wood. As the car was struck, my hand slipped off the brake bar. I do not know which hand I had the prod pole in, or which hand I had hold of the bar. I do not know whether I was standing on. the car towards the front, or on the one towards the rear of the train. I fell backwards. Before going between the cars, I looked toward the head of the train, but did not see the engine. I could see the head of the train plainly. I did not notice about the engine. I was depending on what the conductor said, that there would be no trouble. Before we got to Denton, he said: 'Now, boys, there are some cattle down, and you will have time to get them up. We will stop there for some time, and you will have plenty of time in which to work.' That was all he said. When I started in between the cars, I did not look to see where the engine was. I stopped and listened for the bell. I did not hear any. I did not listen for the whistle. I satisfied myself that the bell was not ringing, and I went in between the cars." He also testified that the engine struck the train hard.

The conductor in charge of the movement of the train testified that the men with the cattle were Mr. Jahn, Mr. Harndon, Mr. Potts, a negro, and Mr. Evans; and Evans was in control. It was also shown that when the train stopped at Denton, the engine was disconnected and carried to the coal chute, about 300 yards from the depot, its supply of coal replenished, and the engine carried back and reconnected with the train; and it was in making this connection that the train was suddenly thrown into motion, which caused the plaintiff to lose his balance, and get his foot caught between the drawheads. It was further shown that if the plaintiff had been watching, he could have seen the engine as it left, and as it returned to the train.

In the case of Railway v. Armstrong, 23 Southwestern Reporter, 236, this court had occasion to consider the duties which a carrier of live stock owes to the shipper or his agent traveling with such live stock; and it was there held that where a trainman in authority tells a shipper of live stock that the train will remain standing for some time at a certain point, and directs him to look after the stock at that time, he may rely on it that the train will not be moved without notice to him, as it is customary for shippers to assume dangerous positions when caring for their stock. We see no reason for changing the views expressed in that case; and, therefore, hold that the testimony in this case warrants the conclusion (and in support of the verdict, we so find) that appellant's employes in charge of the train were guilty of negligence, as charged in appellee's petition, and that he was not guilty of contributory negligence.

The point is made that as appellee was not engaged in any work with or about the Cardwell cattle, but was passing between cars loaded with stock that did not belong to, and for the purpose of attending to an animal that was not owned by Cardwell, therefore, he was guilty of contributory negligence. In our opinion, this position is untenable. It appears from the testimony that the employes sent along by the several shippers were placed under the supervision and control of Evans; and that he had the authority to and in effect did direct each employe, to "punch up" any animal that he saw down, regardless of who might be its owner; and that this arrangement among the shippers was known to and acquiesced in by the conductor in charge of the train. Such being the case, we think it is immaterial whether the animal appellee was attempting to relieve belonged to Cardwell or to one of the other shippers.

This disposes of the most important questions presented in this court. The other matters referred to in appellant's brief have been considered, but our conclusion is that no reversible error is disclosed, and, therefore, the judgment will be affirmed.

*Affirmed.*